JLG/PGS/MEF
F. #2021R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

LENIZ ESCOBAR,
   also known as "Diablita,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 21-CR-101 (JFB)

# MEMORANDUM OF LAW
## IN SUPPORT OF THE GOVERNMENT'S MOTIONS *IN LIMINE*

BREON PEACE
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Paul G. Scotti
Justina L. Geraci
Megan E. Farrell
Assistant U.S. Attorneys
   *Of Counsel*

i

## PRELIMINARY STATEMENT

Trial for defendant Leniz Escobar, also known as "Diablita" ("Escobar" or the "defendant") is scheduled to begin on January 10, 2022.

The Government respectfully submits this memorandum of law in support of its motions *in limine*. Specifically, the Government requests that the Court rule that the following categories of evidence are admissible at trial in this matter: (1) statements made by the defendant's co-conspirators during and in furtherance of the charged murder and obstruction conspiracies; (2) statements made by excited declarants, including the victims, on the night of the murders, and later by others following the discovery of the bodies; and (3) statements made by the defendant, including false exculpatory statements to law enforcement and those made in recorded prison calls.

## BACKGROUND

This matter stems from an ongoing investigation by the Government and the Federal Bureau of Investigation ("FBI") Long Island Gang Task Force (the "Task Force") into acts of violence committed by members and associates of the transnational criminal organization La Mara Salvatrucha, or the "MS-13," operating in various towns across Long Island.

On April 12, 2017, at approximately 8:00 p.m., members of the Suffolk County Police Department ("SCPD") responded to a wooded area adjacent to the Central Islip Recreation Center, located on Clayton Street in Central Islip, New York (the "Recreation Center"). With the assistance of a witness (hereinafter, the "Witness"), investigators found the lifeless bodies of Justin Llivicura ("Llivicura"), Michael Lopez ("Lopez"), Jorge Tigre ("Tigre"), and Jefferson Villalobos ("Villalobos"). All four victims

1

had significant sharp-force and blunt-force injuries covering their bodies.  Following autopsies conducted by the Suffolk County Medical Examiner's Office ("SCMEO"), their deaths were ruled homicides.

Subsequent investigation revealed that Llivicura, Lopez, Tigre, Villalobos, and the Witness had all been lured to the Recreation Center the previous evening (April 11) by two female associates of the MS-13, one of whom was defendant Escobar, because the MS-13 suspected that the Witness and at least one other victim were members of the 18th Street gang – the principal rival of the MS-13 – who had been falsely posing as members of the MS-13, or who were otherwise disrespecting the MS-13.  Pursuant to the rules of the MS-13, their murders were pre-authorized by the gang's leaders, and the members and associates who participated that night, in any form or fashion, would be given "credit" for the kills, and would either obtain a level of membership in the gang, or ascend in rank and status within the gang.

The numerous participating MS-13 members and associates communicated with one another, and coordinated their plans, via cellphone.  Once the Witness and the four victims arrived at the location in the woods, the MS-13 members and associates physically surrounded them and ordered them to the ground.  The Witness immediately ran, and successfully escaped.  The four remaining victims were viciously attacked and killed with close-range hand-held weapons, including machetes, an axe, knives, and tree limbs.  Afterwards, the MS-13 members and associates dragged the four bodies a short distance into the woods and quickly fled, fearful that the Witness would alert the authorities.

Escobar, who had initially claimed to be a victim of this MS-13 ambush, was subsequently observed by law enforcement tossing certain items from the passenger side

window of a moving vehicle. The items were later recovered and identified as Escobar's cellphone and its subscriber identification module ("SIM") card, which had been removed from the cellphone, both of which had been damaged such that law enforcement was unable to retrieve any content from the devices. Additionally, Escobar discarded the bloody clothing that she had been wearing on the night of the murders; and further, she remained in communication with co-conspirators, warning them of law enforcement activity as the investigation continued to unfold.

On February 25, 2021, a grand jury sitting in this district returned the instant Indictment, captioned United States v. Leniz Escobar, 21 Cr. 101 (JFB) (the "Indictment") (ECF Dkt. No. 1),[1] charging defendant Escobar in five counts, with: *(1)* racketeering, in connection with her association with and participation in the affairs of the MS-13 enterprise, from on or about January 1, 2016 through the date of the Indictment, in violation of 18 U.S.C. §§ 1962(c) and 1963 (Count One);[2] *(2)* the murder in aid of racketeering of Llivicura, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Two); *(3)* the murder in aid of racketeering of Lopez, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Three); *(4)* the murder in aid of racketeering of Tigre, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Four); and *(5)* the murder in aid of racketeering of Villalobos, in violation of 18 U.S.C. §§

---

[1] Escobar's charged co-defendant, Anderson Sanchez, pleaded guilty on December 2, 2021 and is awaiting sentencing.

[2] This count is comprised of six racketeering acts. Racketeering Act 1 charges the defendant with conspiracy to murder rival gang members, from in or about March through April 2017. The substantive murders in aid of racketeering of victims Llivicura, Lopez, Tigre, and Villalobos, are charged in Racketeering Acts 2, 3, 4 and 5, respectively. Finally, Racketeering Act 6 charges the defendant with conspiracy to obstruct justice, from approximately April 11, 2017 through July 13, 2017.

3

1959(a)(1) and 2 (Count Five).  Trial is set to begin on January 10 before this Court, as noted above.

## ARGUMENT

**I.    STATEMENTS MADE BY THE DEFENDANT'S CO-CONSPIRATORS ARE ADMISSIBLE**

At trial, the Government intends to introduce statements made – both orally and through electronic evidence (including communications retrieved from cellphones and social media accounts) – by participants in the conspiracy to commit murder in aid of racketeering, and by participants in the conspiracy to obstruct justice.  As set forth below, such statements were made before, during, and after the April 11, 2017 murders, to further the goals of these related and overlapping conspiracies.  These statements are admissible as co-conspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

**A.    Applicable Law**

Under Rule 801(d), an out-of-court statement offered for the truth of its contents is not hearsay if "[t]he statement is offered against an opposing party and" it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  Thus, "[i]n order to admit a statement under this Rule, the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Gupta, 747 F.3d 111, 123 (2d Cir. 2014) (quoting United States v. Maldonado–Rivera, 922 F.2d 934, 958 (2d Cir.1990), cert. denied, 501 U.S. 1233 (1991)).  In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as

4

the contents of the alleged coconspirator's statement itself. See Fed. R. Evid. 801(d)(2); see also Bourjaily v. United States, 483 U.S. 171, 176–81 (1987).

"To be in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir.1999) ("SKW Metals") (quoting United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir.) ("Beech–Nut"), cert. denied, 493 U.S. 933 (1989)). Significantly, while idle chatter between co-conspirators does not further a conspiracy, see United States v. Paone, 782 F.2d 386, 390 (2d Cir.), cert. denied, 479 U.S. 882 (1986), the Second Circuit has recognized that "[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy, further the ends of [a] conspiracy." United States v. Simmons, 923 F.2d 934, 945 (2d Cir.) (quoting United States v. Rahme, 813 F.2d 31, 35–36 (2d Cir.1987) (other internal quotation marks omitted)), cert. denied, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); see, e.g., United States v. Maldonado–Rivera, 922 F.2d at 958–59.

"A finding as to whether or not a proffered statement was made in furtherance of the conspiracy should be supported by a preponderance of the evidence, and such a finding will not be overturned on appeal unless it is clearly erroneous." United States v. Thai, 29 F.3d 785, 814 (2d Cir.), cert. denied, 513 U.S. 977 (1994); see, e.g., United States v. James, 712 F.3d 79, 105–06 (2d Cir. 2013). "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" Beech–Nut, 871 F.2d at 1199 (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)). The court's ultimate decision to admit or exclude a proffered statement is reviewed for abuse of

5

discretion. See, e.g., United States v. Persico, 645 F.3d 85, 99 (2d Cir. 2011), cert. denied, 565 U.S. 1242 (2012); SKW Metals, 195 F.3d at 87–88.

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive. It permits introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Indeed, the requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991), United States v. Dresna, 260 F.3d 150, 159 (2d Cir. 2001), as do statements "that apprise a co-conspirator of the progress of the conspiracy," United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987). See also United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

Statements that describe past events can likewise be in furtherance of a conspiracy. See United States v. Dresna, 260 F.3d 150, 159 (2d Cir. 2001) (in prosecution of

6

members of motorcycle gang, admission of statements made at gang meeting that recounted attempted arson committed by gang affiliate were admissible in prosecution of affiliate because statements "could be understood as informing other co-conspirators about the status of the conflict between two gangs, and perhaps as an exhortation to avoid ridicule by doing things right"). Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted).

      Finally, although the Government must demonstrate that the defendant and the declarant belonged to the same conspiracy, the defendant and declarant do not both need to be members of the charged conspiracy in order for the declarant's statement to be admissible against the defendant. See United States v. Bowe, 221 F.3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a coconspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993); United States v. Lyles, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); see also United States v. Stratton, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); Maldonado-Rivera, 922 F.2d at 962 (same). Rather, "[t]he Government merely needs to demonstrate that the declarant and the defendant against whom the statements are offered are members of a conspiracy in furtherance of which the statements are made, and that this conspiracy is factually intertwined with the offenses being tried."

7

Stratton, 779 F.2d at 829 (internal citations and quotation marks omitted); see also Maldonado-Rivera, 922 F.2d at 962 ("Though . . . Federal Rule of Evidence 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment. Indeed, coconspirator statements are admissible if the prerequisites of Federal Rule of Evidence 801(d)(2)(E) are met *even where no conspiracy offense is charged*." (emphasis supplied)).[3]

    **B.**    **Discussion**

The Government intends to offer statements made by the defendant's co-conspirators during and in furtherance of the charged conspiracies to commit murder in aid of racketeering (Racketeering Act 1) and to obstruct justice (Racketeering Act 6).[4] These statements consist both of oral in-court testimony from two cooperating witnesses, as well as written statements obtained from electronic evidence – i.e., communications between and

---

[3] See also, e.g., United States v. DeVillio, 983 F.2d 1185, 1193 (2d Cir. 1993) ("It is now well established that the applicability of the co-conspirator exception to the hearsay rule is not conditioned on the presence of a conspiracy count in the indictment." (quotation marks omitted)); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999) (with respect to the "coconspirator exception to the hearsay definition, . . . [t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment"); United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002) ("As the Gigante opinion observed, the objective of the joint venture need not be the crime charged in the indictment (or the objective of the conspiracy charged in the indictment)"); United States v. Ulbricht, 79 F. Supp. 3d 466, 483 (S.D.N.Y. 2015) ("[E]vidence may be admitted pursuant to the coconspirator exception whether or not the conspiracy which such evidence is alleged to be in furtherance of is the charged conspiracy").

[4] "[S]tatements proffered as co[-]conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of [relevant] prerequisites." United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993).

8

among the co-conspirators via standard text-messages and other messaging applications such as WhatsApp, Snapchat, and Facebook Messenger.

The two cooperating witnesses – hereinafter CW-1 and CW-2 – are associates of the MS-13, who participated in the April 11, 2017 murders with the defendant. They were each charged with these crimes, and have pleaded guilty, and are expected to testify at trial, pursuant to a cooperation agreement with the Government. Both CW-1 and CW-2 engaged in numerous planning discussions with other MS-13 members and associates,[5] including (but not necessarily always) with the defendant herself, in the days and weeks leading up to the April 11, 2017 murders, for the purpose of vetting the target(s), forming a plan to lure the victims to a secluded wooded area under a false pretense, assigning roles, and amassing the participants. On the night of the murders, CW-1 and CW-2 both participated, though their roles were very different; and each of them are expected to testify as to what they heard other participants say during the course of the night, including just before the five would-be victims arrived; then during the corralling of the victims, and the flight of the Witness; and, of course, during the execution of the remaining four victims. Finally, CW-1 and CW-2 are expected to testify regarding further discussions with their co-conspirators – including conversations with the defendant – in the hours, days, and weeks after the murders occurred, including those regarding attempts to lure the Witness back into the woods to be killed, the destruction of evidence (the discarding of bloody clothing, for example), plans to flee the

---

[5] A number of these co-conspirators are charged with these same murders in the matter captioned United States v. Jhonny Contreras, et al., 16 Cr. 403 (S-7) (JFB). Others are, or have been, charged separately, as juveniles and/or cooperators. Still others remain uncharged.

area to avoid apprehension by the police, and strategy for communications with law enforcement. Additionally, the co-conspirators conferred extensively about whether the Witness would alert, or had already alerted, law enforcement authorities; discussed the destruction of evidence and methods for evading law enforcement detection (including by obtaining new phones or new phone numbers, and by using messaging applications like Text Now in lieu of traditional text-messaging); concocted false narratives to tell the police and the Witness, in an effort to conceal their own involvement in these crimes; and apprised one another about who among them had been brought in for questioning and eventually arrested.[6] All such statements, made by declarants who were themselves members of the same murder and obstruction conspiracies as the defendant, clearly promote the goals of the related conspiracies, and are therefore admissible. These statements were made in order to plan the murders, to appraise other co-conspirators of the progress or status of the conspiracy, to facilitate and encourage the assistance of other co-conspirators, and to foster the cohesiveness of the conspiracy.

---

[6] "[E]ven where particular crimes have already been committed, 'the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated.'" United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989); see also United States v. Diaz, 176 F.3d 52, 86-87 (2d Cir. 1999) (admitting recorded telephone call between co-conspirators, which occurred *after* the murders, discussing the murders and the ensuing police investigation, under Rule 801(d)(2)(E), holding that the statements were made in furtherance of the racketeering conspiracy, irrespective of whether or not the conspiracy to murder was completed). "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." United States v. Greenfield, 44 F.3d 1141, 1150 (2d Cir. 1995) (quoting United States v. Panebianco, 543 F.2d 447, 453 (2d Cir. 1976)). The fact that some of the co-conspirators had been criminally charged or incarcerated does not inevitably lead to the conclusion that the conspiracy has been terminated. United States v. Paredes, 176 F.Supp.2d 183, 189 (S.D.N.Y. 2001); see also United States v. Persico, 832 F.2d 705, 715–16 (2d Cir.1987) (conspiracy continued after incarceration of some members).

As noted above, CW-1, CW-2, and other co-conspirators, including the defendant, communicated between and among one another, as well as with the Witness, via standard text and messaging applications, including Facebook Messenger and WhatsApp, before and after the April 11, 2017 murders. In these electronic communications, the co-conspirators discussed, inter alia, the identity of the target(s), conferred regarding the timing of their plan and optimal circumstances for its execution, coordinated their locations and availability, and verified each other's participation and commitment to the plan. Certain of the co-conspirators corresponded amongst each other regarding an earlier attempt to lure the Witness to his death; and corresponded directly with the Witness to discern his availability on the night of the murders. After the murders, the co-conspirators discussed, via text-message, the destruction of evidence, who among them had been approached by law enforcement and later arrested, the fact that the Witness had notified law enforcement of the murders, and who among the co-conspirators might be cooperating with law enforcement. These electronic communications, for the most part, dovetail with the testimony of CW-1 and CW-2.[7] For the reasons set forth above with respect to testimony regarding co-conspirator statements, electronic communications containing similar statements are also admissible.

---

[7] In addition to the electronic communications that will be introduced as exhibits at trial in this matter, oral testimony from CW-1 and CW-2 will also detail certain text-message communications among the co-conspirators which the Government does not possess.

## II. STATEMENTS MADE BY DECLARANTS ON THE NIGHT OF THE MURDERS, AND FOLLOWING THE DISCOVERY OF THE FOUR BODIES, ARE ADMISSIBLE

The Government expects that CW-1 and CW-2, among other witnesses, will testify about what they heard other declarants – specifically, certain of the victims and the Witness – say on the night of the murders. Additionally, the Government expects that other witnesses, including law enforcement witnesses, will testify about what they heard the family members and loved ones of the victims say after learning of the discovery of the four bodies for the first time. Under the circumstances, these statements are admissible.

### A. Applicable Law

Rule 803(2) of the Federal Rules of Evidence excepts from the general exclusion of hearsay statements, even if the declarant is available, a "statement relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition." Fed. R. Evid. 803(2). The rationale underlying the "excited utterance" exception is that "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." United States v. Tocco, 135 F.3d 116, 127 (2d Cir.1998); see also United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001) ("[E]xcitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable"); United States v. Joy, 192 F.3d 761, 766 (7th Cir. 1999) ("This exception is premised on the belief that a person is unlikely to fabricate lies (which presumably takes some deliberate reflection) while his mind is preoccupied with the stress of an exciting event."). "Thus, to qualify as an excited utterance, 'the declarant's state of mind at the time the statement was made [must] preclude[ ] conscious reflection on the

subject of the statement.'" United States v. Alexander, 331 F.3d 116, 121-22 (D.C. Cir. 2003) (quoting Joy, 192 F.3d at 766).

For a statement to qualify as an excited utterance, the proponent of the exception must establish: "(1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event." Alexander, at 122-23 (citations omitted). Unlike the hearsay exception for present sense impressions, see Fed. R. Evid. 803(1), "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." Tocco, 135 F.3d at 127 (three-hour delay); see also United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990) (five or six hour delay); Gross v. Greer, 773 F.2d 116, 119-20 (7th Cir. 1985) (twelve hour delay). "Rather the utterance must be contemporaneous with the excitement engendered by the startling event." Joy, 192 F.3d at 766 (citations omitted).

Although the lapse of time between the startling event and the statement is relevant to whether the declarant made the statement while under the stress of excitement, the temporal gap between the event and the utterance is not itself dispositive. See United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002). Other relevant factors include: the characteristics of the event; the subject matter of the statement; whether the statement was made in response to an inquiry; and the declarant's age, motive to lie, and physical and mental condition. See United States v. Marrowbone, 211 F.3d 452, 454-55 (8th Cir. 2000).

**B.  Discussion**

The Government anticipates that CW-1 and/or CW-2 will testify about what they heard one or more of the decedent-victims and/or the Witness say as the MS-13 members and associates surrounded them, and ordered them to the ground, just before the

13

murders. These statements, made by the victims while under the stress of excitement and fear, and contemporaneously with the startling events of that night, are unquestionably admissible as excited utterances, pursuant to Rule 803(2). Similarly, the Government expects that one or more witnesses, who talked on the phone with the Witness and later met him that same night, shortly after the Witness fled from the murderers, will testify about what they heard the Witness say, while the Witness was still under the stress of excitement.

Finally, the Government expects that certain law enforcement witnesses will testify about what they heard family members and loved ones of the victims say immediately following the news of the discovery of the four bodies in the woods. These contemporaneous utterances, made while the declarants were unquestionably under the stress of excitement caused by the horrific and shocking news, are admissible pursuant to Rule 803(2).

## III.   STATEMENTS MADE BY THE DEFENDANT ARE ADMISSIBLE

The Government intends to introduce at trial certain statements made by the defendant; in particular: (1) statements that the defendant made during several non-custodial, voluntary interviews with law enforcement in 2017, shortly after the murders occurred, during which she falsely claimed, in substance and in part, to be a victim and to have had her cellphone stolen; (2) statements the defendant made to others, including to non-co-conspirator MS-13 members, about the murders, including explaining her role in the murders and attempting to recruit a ranking MS-13 member to participate in the murders; and (3) statements that the defendant made in recorded prison phone calls, in which the defendant participated both prior to her own incarceration, and also while incarcerated on the charges in

14

this case. Each of these categories of statements is admissible as a non-hearsay statement of a party opponent.

### A.     Applicable Law

Pursuant to Federal Rule of Evidence 801(d)(2)(A), a statement that is offered against a party opponent and that was made by that party in an individual capacity is not hearsay. "Statements made by the defendant," where relevant, "may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." United States v. Russo, 302 F.3d 37, 43 (2d Cir. 2002); see also United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("a party's own statement, if offered against him, is not hearsay."); United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006). Statements made by a defendant are generally admissible "regardless of whether such statements were against his interest when made." Id.

Moreover, statements made by other parties during conversations with a party opponent may be admitted "as necessary context [for the statements by the party-opponent] and not for their truth." United States v. Guang Ju Lin, 505 F. App'x 10, 13 (2d Cir. Dec. 10, 2012); see also United States v. Dupre, 462 F.3d 131, 136-37 (2d Cir. 2006) (allowing admission of emails sent by third parties to defendants, as context for defendants' responses); Arista Records LLC v. Lime Group LLC, 784 F. Supp. 2d 398, 420 (S.D.N.Y. 2011) ("Where a statement is deemed admissible as an admission by a party-opponent under Rule 801(d)(2), the surrounding statements providing essential context may also be considered."). See also United States v. Mojica, No. 19-CR-280 (RA), 2021 WL 982458, *6 (S.D.N.Y. Mar. 16, 2021) (records of [defendant's] calls from jail …. are themselves admissible as non-hearsay party-opponent statements, [per] Fed. R. Evid. 801(d)(2) …").

Finally, it is well-settled in the Second Circuit that evidence of a false exculpatory statement is admissible as circumstantial evidence of consciousness of guilt. See, e.g., Henry v. Poole, 409 F.3d 48, 65 (2d Cir. 2005) ("It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.") (quoting United States v. Parness, 503 F.2d 430, 438 (2d Cir. 1974)); United States v. Gaskin, 364 F.3d 438, 462 (2d Cir. 2004) (inference of criminal intent "was strengthened by [defendant's] post-arrest false exculpatory statement denying ownership or knowledge of the [cash]"); United States v. Glenn, 312 F.3d 58, 69 (2d Cir. 2002) (false exculpatory statements may amount to "circumstantial evidence of consciousness of guilt and may strengthen inferences supplied by other pieces of evidence").[8]

**B.    Discussion**

The Government expects to call certain law enforcement witnesses who will testify as to the defendant's non-custodial, voluntary statements to them regarding the murders. Specifically, on or about April 13, 2017, the defendant voluntarily spoke to members of the SCPD, and even provided a sworn, hand-written statement to them, detailing a false account of the murders, in which she claimed, in substance and in part, that she was an unwitting victim of an ambush by MS-13 members, who stole her cellphone, just before they murdered the four victims. The defendant persisted in this false narrative in other non-custodial, voluntary conversations with law enforcement on or about April 14, 2017 and on

---

[8] The Government will also seek an appropriate jury instruction with respect to the defendant's false exculpatory statements, assuming they are admitted at trial as requested herein.

16

or about April 17, 2017. The defendant's non-custodial statements to law enforcement will be shown at trial to be demonstrably false. They are nevertheless admissible as false exculpatory statements, under well settled law, as they serve to demonstrate her consciousness of guilt and the lengths she was willing to go to obstruct the fresh, ongoing investigation into the murders.[9]

The Government further intends to elicit testimony from a certain cooperating witness – hereinafter, "CW-3" – who was a ranking member of the MS-13, and to whom the defendant spoke at length about the April 11, 2017 murders during the planning phase.[10] In substance and inter alia, the defendant told CW-3 that she had been tasked with luring the Witness into the woods, showed CW-3 a picture of the Witness, and asked CW-3 to participate in the murders. Furthermore, CW-3 is expected to testify regarding the defendant's destruction of certain evidence following the April 11, 2017 murders. The defendant's statements to CW-3 are admissible, as stated above.

Finally, the Government intends to introduce at trial two categories of recorded prison calls – (1) the recorded prison calls of a certain MS-13 member who was incarcerated at the Suffolk County Riverhead Correctional Facility, to whom the defendant spoke on or about April 11, April 12, and April 13, 2017; and (2) the recorded prison calls of another MS-13 member who was incarcerated at the Queens Detention Facility, to whom the

---

[9] When the defendant was ultimately arrested by law enforcement on or about July 13, 2017, she was given Miranda warnings but refused to speak with law enforcement at that time.

[10] CW-3 is not a co-conspirator in the charged murder conspiracy. CW-3 has pleaded guilty to other, unrelated crimes committed on behalf of the MS-13 enterprise, and will be testifying at trial pursuant to a cooperation agreement with the Government.

defendant spoke (while she herself was incarcerated at the Essex County Juvenile Detention Center) on or about April 10 and April 11, 2020.[11]  The defendant's statements to these incarcerated MS-13 members, which were recorded by their respective jail facilities, are admissible against her as statements of a party opponent.

        The questions posed by law enforcement members during the non-custodial interviews of the defendant, and the questions and statements of third parties, like CW-3 and the two incarcerated MS-13 members captured in the prison calls, that prompted responses from the defendant, are also admissible, not for the truth of any facts asserted therein, but for the non-hearsay purpose of providing essential context to the defendant's statements.

---

[11] Neither of these two incarcerated MS-13 members participated in the charged murders.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted in their entirety.

Dated:   Central Islip, New York
         December 20, 2021

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        610 Federal Plaza
                                        Central Islip, New York 11722


                               By:      /s/ Paul G. Scotti
                                        Paul G. Scotti
                                        Justina L. Geraci
                                        Megan E. Farrell
                                        Assistant United States Attorneys
                                        (631) 715-7836/-7835/-7862