# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 21-CR-101 (JFB)

---

UNITED STATES OF AMERICA,

VERSUS

LENIZ ESCOBAR,

Defendant.

---

**MEMORANDUM AND ORDER**
March 4, 2024

---

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

On April 11, 2022, defendant Leniz Escobar (hereinafter, "Escobar") was convicted following a jury trial of one count of racketeering in connection with her association with, and participation in the affairs of, a criminal enterprise, in violation of 18 U.S.C. §§ 1962(c) and 1963, and four counts of murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. The charges related to the murders of Justin Llivicura, Michael Lopez, Jorge Tigre, and Jefferson Villalobos in a wooded area near Central Islip Recreational Center in Central Islip, New York on April 11, 2017 (hereinafter, the "April 11 murders").

Escobar moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, and for a new trial, pursuant to Federal Rule of Criminal Procedure 33(a). (ECF Nos. 133, 149). For the reasons set forth below, this Court denies Escobar's motions for judgment of acquittal and a new trial in their entirety.

## I. BACKGROUND

On July 10, 2017, the government filed a Juvenile Information against Escobar charging her with one count of racketeering by engaging in conspiracy to murder and murder, 18 U.S.C. § 1962(c); one count of racketeering conspiracy, 18 U.S.C. § 1962(d); one count of conspiracy to murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); and four counts of murder in aid of racketeering, 18 U.S.C. §§ 1959(a)(1) and 2. On July 13, 2017, Escobar was arrested pursuant to those charges and detained.

On May 18, 2018, the government filed a Superseding Juvenile Information, which charged the defendant with the counts contained in the initial Juvenile Information and added conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k), as an additional racketeering act. That charge

arose from the defendant's alleged attempts to destroy evidence relating to the April 11 murders and to otherwise impede the investigation.

The government also moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On May 18, 2018, after receiving written submissions from the parties, the Court held a hearing on the motion. On June 11, 2018, the Court issued a Memorandum and Order transferring Escobar to adult status. On December 3, 2019, the Second Circuit affirmed the transfer decision.

On February 25, 2021, a grand jury returned an indictment charging Escobar with five counts: (1) racketeering in connection with her association with, and participation in the affairs of, the MS-13 criminal enterprise, from on or about January 1, 2016 through the date of the indictment, in violation of 18 U.S.C. §§ 1962(c) and 1963 (Count One);[1] (2) the murder in aid of racketeering of Justin Llivicura, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Two); (3) the murder in aid of racketeering of Michael Lopez, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Three); (4) the murder in aid of racketeering of Jorge Tigre, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Four); and (5) the murder in aid of racketeering of Jefferson Villalobos, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Five).

The trial commenced on March 14, 2022, and the government presented testimony of thirteen witnesses and introduced approximately one hundred exhibits into evidence. At the close of evidence, Escobar orally moved for a judgment of acquittal under Rule 29, which the Court denied on the record. *See* Trial Tr. at 1370–74. At the conclusion of trial on April 11, 2022, the jury rendered a verdict of guilty on all five counts of the indictment.

On May 23, 2022, Escobar filed a renewed motion for a judgment of acquittal under Rule 29 or, in the alternative, for a new trial pursuant to Rule 33, challenging the legal sufficiency of the evidence on Counts Two through Five (hereinafter, the "Escobar Rule 29 Br."). On June 21, 2022, the government filed its opposition. On June 28, 2022, Escobar filed her reply.

On November 1, 2022, Escobar filed a supplemental motion for a new trial under Rule 33 on several additional grounds (hereinafter, the "Escobar Rule 33 Br."). On March 20, 2023, the government filed its opposition (hereinafter, the "Gov. Rule 33 Opp."). On May 3, 2023, Escobar filed her reply.

On August 31, 2023, the Court heard oral argument on the post-trial motions.

II.   STANDARD OF REVIEW

A. Rule 29 Motion for Acquittal

Pursuant to Rule 29(a), a district court shall "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P.

---

[1] Count One contained six racketeering acts. Racketeering Act One charged Escobar with conspiracy to murder rival gang members, in violation of New York Penal Law §§ 125.21(1) and 105.15, from in or about March 2017 through April 2017. Racketeering Acts Two through Five consisted of substantive murder charges, in violation of New York Penal Law §§ 125.21(1) and 20.00, for each of the four victims, respectively. Racketeering Act Six charged Escobar with conspiracy to obstruct justice, from approximately April 11, 2017 through July 13, 2017, in violation of 18 U.S.C. § 1512(c)(2) and (k).

2

29(a). However, as set forth below, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)); *accord United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)); *see also United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (stating that "motions challenging the sufficiency of the evidence rarely carry the day").

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979*); accord Lorenzo*, 534 F.3d at 159; *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). In other words, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Temple*, 447 F.3d at 136 (alteration adopted) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez*, 447 F.3d 145, 154–55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (explaining that "Rule 29[] does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (alterations adopted) (internal quotation marks and citation omitted)).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999) (internal quotation marks and citations omitted); *accord United States v. Khan*, 53 F.3d 507, 514 (2d Cir. 1995) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own."). In examining the sufficiency of the evidence, the court also should not analyze pieces of evidence in isolation, but rather consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna*, 183 F.3d at 130 (explaining that "the [sufficiency] test must be applied to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; 'in fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (alteration adopted) (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving*, 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson*, 335 F.3d at 180; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

3

However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks and citation omitted); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In short, "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'" *Temple*, 447 F.3d at 137 (alteration adopted) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)). On the other hand, "in passing upon a motion for a directed verdict of acquittal, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted." *Id.* (alteration adopted) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

B. Rule 33 Motion for a New Trial

Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion "only in extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks and citations omitted), and only if there exists "a real concern that an innocent person may have been convicted," *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009). *See also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. "In deciding a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted).

III. DISCUSSION

A. Rule 29 Motion

In her Rule 29 motion, Escobar argues that the trial evidence was insufficient to establish the motive element for the Section 1959 charges (Counts Two through Five), which required the government to prove that her purpose for committing the April 11 murders was to maintain or increase her position in the MS-13.[2] For the reasons set forth below, the Court disagrees and denies Escobar's Rule 29 motion in its entirety.

1. Applicable Law under Section 1959

To obtain a conviction for murder in aid of racketeering, the government must prove, *inter alia*, that Escobar acted "for the purpose of gaining entrance to or maintaining or increasing [her] position" in the racketeering enterprise—here, the MS-13. 18 U.S.C. § 1959(a). The Second Circuit has explained that "[i]n defining the scope of conduct satisfying the position-related motivation

---

[2] Escobar does not challenge the sufficiency of the evidence with respect to the other elements of the charged crimes.

4

requirement under [S]ection 1959, we do not write on a blank slate." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001). "Although [Section] 1959(a) does not define the phrase 'for the purpose of maintaining or increasing a defendant's position in an enterprise,' we interpret that phrase by its plain terms, giving the ordinary meaning to its terms." *United States v. Bruno*, 383 F.3d 65, 83 (2d Cir. 2004) (alterations adopted) (citation omitted). "Thus, on its face, [Section] 1959 encompasses violent crimes intended to preserve a defendant's position in an enterprise or to enhance [her] reputation and wealth within that enterprise." *Id.* (alterations adopted) (citation omitted).

Further, the meaning of the phrase "'maintaining or increasing position' should be construed liberally." *United States v. Rahman*, 189 F.3d 88, 127 (2d Cir. 1999). Therefore, the prospect of increasing or otherwise maintaining one's status in the criminal organization need not be "the defendant's sole or principal motive"; rather, the element is satisfied "if the jury could properly infer that the defendant committed [her] violent crime because [she] knew it was expected of [her] by reason of [her] membership in the enterprise or that [she] committed it in furtherance of that membership." *United States v. Pimentel*, 346 F.3d 285, 295–96 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also United States v. Arrington*, 941 F.3d 24, 38 (2d Cir. 2019) ("[Section] 1959 required the Government to prove that [the defendant] committed a crime of violence at least in part 'for the purpose of maintaining or increasing his position in' the [criminal] enterprise." (alterations adopted) (quoting 18 U.S.C. § 1959(a)); *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) ("Self-promotion need not have been the defendant's only, or even primary, concern, if [the crime] was committed as an integral aspect of membership in the enterprise." (internal quotation marks and citation omitted)).

2. Analysis

Escobar acknowledges that the government "presented evidence that [she] was an 'associate' of the MS-13" and that, although her gender precluded her from becoming a full "member" of the gang, "[w]itnesses testified that female associates of the gang did such things as transporting drugs and weapons, and luring members of rival gangs to places where they could be attacked." Escobar Rule 29 Br. at 2. Escobar nevertheless contends that her status as an associate was solely the function of her romantic relationship with Jeffrey Amador—a full MS-13 member—and that "there was little evidence that, prior to the murders of the four victims, she had ever done anything to help the MS-13."[3] *Id.* Thus, as Escobar argued to the jury in summation, "[w]hatever benefit she got was not because she was an associate"; rather, "[i]t was from being a girlfriend." Trial Tr. at 1481. In challenging the sufficiency of the proof regarding her motivation, Escobar asserts that "[t]here was no direct evidence that [she] had acted with the purpose of maintaining and increasing her position in the MS-13." Escobar Rule 29 Br. at 3.

The Court finds Escobar's arguments unpersuasive. As discussed *supra*, it is well settled that the government can prove the elements of a crime, including motivation and intent, "entirely by circumstantial evidence." *United States v. LaSpina*, 299 F.3d 165, 180 (2d Cir. 2002) (internal

---

[3] Escobar concedes that there was evidence that, prior to her participation in the April 11 murders, she used a car belonging to the MS-13's Brentwood clique and she attended at least one MS-13 meeting. Escobar Rule 29 Br. at 2.

5

quotation marks and citation omitted); *see also Jackson*, 443 U.S. at 324–25 ("From the circumstantial evidence in the record, it is clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing."). Here, even if Escobar had a personal motive, unrelated to her desired association with the MS-13, to participate in the April 11 murders because she was Amador's girlfriend (even though Amador was not involved in the murders and did not approve of them), the circumstantial evidence, which is summarized below, was more than sufficient to support a rational finding by the jury that she was motivated to participate in the murders, at least in part, to maintain or increase her position of trust and respect as an associate of the MS-13. *See United States v. Capers*, 20 F.4th 105, 115 (2d Cir. 2021) ("As we have held in the . . . context of murder in aid of racketeering in violation of 18 U.S.C. § 1959, there is no inconsistency between a crime that is motivated in part by personal objectives and a finding that the crime was also committed 'at least in part' for purposes related to a criminal enterprise." (quoting *Arrington*, 941 F.3d at 38)).

First, the government offered evidence through the testimony of three cooperating witnesses from the MS-13—Sergio Vladimir Segovia-Pineda, Keyli Gomez, and David Antonio Gaitan-Rivera—each of whom testified that, although full gang membership was foreclosed to women, female associates played important roles in the MS-13 in maintaining and carrying out the gang's objectives. *See, e.g.*, Trial Tr. at 330–32-C, 744-C, 1048-C. Indeed, the testimony established that one of the central functions of female MS-13 associates was identifying and luring out purported rival gang members for attack and murder by the MS-13. *See* Trial Tr. at 331–32-C, 744-C, 1048-C. That is precisely the role that Escobar played in connection with the April 11 murders, which targeted purported members of the rival 18th Street gang who had disrespected the MS-13. *See* Trial Tr. at 362-C, 710-C, 810–11-C. Therefore, the basis for targeting the victims and Escobar's role as an associate of the gang in identifying and luring the victims provided strong circumstantial evidence of her motivation. *See United States v. Laurent*, 33 F.4th 63, 77 (2d Cir. 2022) (upholding Section 1959 conviction where evidence showed that the defendant "believed that [the victim] was a member of the rival . . . gang" and that the defendant's gang "considered it their duty to commit violence, including murder, against rival gang members"); *United States v. White*, 7 F.4th 90, 102 (2d Cir. 2021) (concluding that evidence of a rivalry between the defendant's and victim's gangs was sufficient to sustain Section 1959 conviction).

Second, the government's witnesses testified that the charged April 11 murders were of special interest to the MS-13, because: (1) male associates and members were assured swift promotion in the gang's hierarchy if they participated in the murders, *see, e.g.*, Trial Tr. at 321, 486–87, 713–14-C; and (2) although barred from formal promotion, female associates—including Escobar—stood to gain the coveted trust and respect of the gang from their involvement in the murders, *see, e.g., id.* at 470 (Escobar "would be provided respect and protection because of her role [in the murders] . . . . not just from the clique of those who were there, but also from many other [MS-13] cliques."); *id.* at 828-C (Escobar stood to gain "[t]rust from any member of the MS-13 and respect."); *id.* at 1048-C (Female associates can receive "[r]espect and trust . . . [f]rom the gang, from MS-13.").

Such testimony provided strong circumstantial evidence from which a rational jury could find that Escobar was

6

motivated to participate in the April 11 murders to "preserve [her] position [as an associate] in the enterprise or to enhance [her] reputation . . . within that enterprise." *Dhinsa*, 243 F.3d at 671 (emphasis omitted); *see also United States v. Farmer*, 583 F.3d 131, 143–44 (2d Cir. 2009) ("The government was not required to prove that [the defendant's] sole or principal motive was maintaining or increasing his position, so long as it proved that enhancement of status was among his purposes." (internal quotation marks and citation omitted)); *United States v. Robertson*, 736 F.3d 1317, 1331 (11th Cir. 2013) (holding that "the testimony supports the inference that [the defendant], at the time of the murders, was motivated to kill others in order to bolster his credibility as a member of the group"). At a minimum, a rational jury could find that Escobar was motivated to participate in the murders by luring the victims because she was expected to do so as a female associate of the gang. *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (holding that "the motive requirement [is] satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership"); *see also United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996) ("[T]he jury properly could have inferred from the evidence of the enterprise's policies of mutual support, violent retaliatory action, and group expectations of its members that both [defendants] participated in the killing of [one victim] and the contemporaneous wounding of [another victim] as an integral aspect of their membership in the enterprise and in furtherance of its policies." (alterations adopted) (internal quotation marks and citation omitted)); *United States v. Fiel*, 35 F.3d 997, 1005 (4th Cir. 1994) ("A rational jury could conclude that defendants believed that participation in the war against the [rival gang] was expected of them by reason of their membership in the [gang].").

Third, the government presented additional, corroborating evidence showing that Escobar stood to gain, and in fact did gain, considerable trust and respect for her actions because, following the April 11 murders, she was consulted (during recorded prison calls) by MS-13 members about whether to discipline a female associate for contravening MS-13 rules. *See* Gov. Exs. 808-T, 810-T, and 812-T.

To the extent Escobar suggests that her status as an associate and inability to become an MS-13 member due to her gender made it impossible for her to seek to maintain or increase her position with the gang, the Court finds that argument to be without merit. Although associates may not enjoy all of the benefits conferred upon full members of a criminal enterprise, this distinction does not necessarily take such associates outside the ambit of Section 1959. Thus, the purpose element is satisfied if the associate commits the act of violence, at least in part, to increase her stature as an associate, or even to simply maintain her current associate position with the gang. *See United States v. Brady*, 26 F.3d 282, 290 (2d Cir. 1994) (holding that "[t]here was substantial evidence before the jury to support its conclusion that [the defendant], even as an associate, was a member of the enterprise who was participating in the murder conspiracy to improve his position in that organization"); *see also United States v. Vernace*, 811 F.3d 609, 618 (2d Cir. 2016) ("The fact that the three participants in the [murders] were only . . . associates and not inducted soldiers was not dispositive. We look at the criminal activities in which alleged participants in the racketeering enterprise engage, not merely the labels that the enterprise uses to describe them."); *United States v. Malpeso* 115 F.3d 155, 164

7

(2d Cir. 1997) (upholding conviction under Section 1959 because jury could reasonably conclude that the defendant killed to maintain or increase his "associate" position in the criminal organization).

Escobar further contends that any such position-related motive was lacking because her participation in the murders hurt her status with the MS-13, which was based on her relationship with Amador, and, "as the jail calls with Amador show, he was unhappy with her involvement in the murders." Escobar Rule 29 Br. at 6. However, the fact that her imprisoned MS-13 boyfriend was later unhappy with her involvement in the April 11 murders does not demonstrate a lack of motivation by Escobar, *at the time of the murders*, to maintain or increase her position or prestige in the gang. *See, e.g., United States v. Blondet*, No. S13 16-CR-387 (JMF), 2022 WL 17370032, at *10 n.5 (S.D.N.Y. Dec. 2, 2022) ("The question of whether a defendant committed a violent crime for the purpose of maintaining or increasing his position in an enterprise turns on his purpose *at the time of the crime*. Whether the defendant actually did maintain or increase his position as a result of the crime—that is, what happened after the crime—does not speak directly to that question."). In any event, as noted above, there was evidence that Escobar's prestige in the gang did, in fact, increase after the April 11 murders given the gang's consultation with her about whether another female associate should be disciplined for violating the gang's rules. *See, e.g., Vernace*, 811 F.3d at 618 (noting that "[the defendant] was not punished for participating in the [murders]—he was, indeed, ultimately entrusted with ruling authority" (emphasis omitted)).

Finally, although Escobar contends in her reply that each piece of evidence relied upon by the government is, in isolation, insufficient to establish the requisite motive, it is well settled, as discussed *supra*, that "the reviewing court must consider pieces of evidence not in isolation, but in conjunction." *Rosenthal*, 9 F.3d at 1024. In sum, viewing all the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, a rational juror could conclude that Escobar participated in the April 11 murders in order to maintain or increase her position as an associate of the MS-13. Accordingly, the Court denies the Rule 29 motion.[4]

B. Rule 33 Motion

Escobar also has moved for a new trial under Rule 33 based upon: (1) an alleged *Brady* violation given the government's failure to provide certain impeachment material for a government witness and the government's corresponding use of perjured testimony by that witness; and (2) newly discovered evidence regarding the availability of a defense witness who would purportedly offer testimony favorable to Escobar. The Court addresses each argument in turn.

1. Alleged *Brady* Violation and Use of Perjured Testimony

Escobar argues that Segovia-Pineda, one of the government's cooperating witnesses, falsely testified that he did not participate in an MS-13 rape, and that "the government failed to disclose information they possessed showing they knew, or should have known, that Pineda testified falsely." Escobar Rule 33 Br. at 1.

---

[4] To the extent that Escobar moves in the alternative for a new trial under Rule 33 on this same ground, that motion is denied for the same reasons.

Segovia-Pineda testified over several days about his involvement in the MS-13 gang, his participation in the April 11 murders, Escobar's involvement in those murders, and Escobar's efforts to thwart law enforcement's investigation after the murders. During cross-examination, Segovia-Pineda testified, for the first time, that he was made aware that a fellow MS-13 member known as "Santanico" raped a woman at an abandoned house in Central Islip several months before the April 11 murders, but that he (Segovia-Pineda) was not present for the rape. *See* Trial Tr. at 519–22.

Following the trial, the government disclosed to defense counsel proffer notes from an interview of another cooperating defendant (who did not testify at trial, and whose identity is sealed) (hereinafter, "Cooperating Defendant #1") indicating that Segovia-Pineda had assisted in luring the victim to the location, was present during the rape, and had, along with others, prevented her from leaving. Although the proffer notes are dated June 24, 2019, before Escobar's trial, the government represents that the proffer notes were only uncovered after Escobar's trial during the unrelated review and provision of materials to Cooperating Defendant #1's newly appointed counsel. *See* Gov. Rule 33 Opp. at 3.[5]

Escobar asserts that a new trial is warranted based on the government's failure to properly disclose this information regarding Segovia-Pineda's involvement in the rape, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, as well as the government's use of Segovia-Pineda's trial testimony regarding his lack of involvement in the rape that it knew or should have known was false.

a. Applicable Law

There are three requirements for a *Brady* violation: (1) that evidence favorable to the accused was (2) suppressed—either willfully or inadvertently—by the prosecution and (3) that prejudice ensued. *See United States v. Douglas*, 525 F.3d 225, 244–45 (2d Cir. 2008); *accord Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The third requirement is also sometimes labeled the "materiality" requirement and asks whether, had the information been disclosed, there would be a "reasonable probability of a different result." *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (internal quotation marks and citation omitted omitted); *see also Strickler*, 527 U.S. at 289; *Ramirez v. Phillips*, No. 04 Civ. 1516 (BMC), 2007 WL 2362138, at *2 (E.D.N.Y. Aug. 14, 2007) ("'Material' means that the information must 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995))).

The Second Circuit "has frequently recognized [that] 'evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (alteration adopted) (quoting *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997)).

---

[5] In connection with this post-trial disclosure to Escobar, the government also disclosed that another non-testifying cooperating defendant ("Cooperating Defendant #2") had corroborated Segovia-Pineda's account of his whereabouts the night of rape, thereby contradicting Cooperating Defendant #1's proffered version of events. The government provided the substance of Cooperating Defendant #2's statement corroborating Segovia-Pineda's version, but not his identity. *See* Gov. Rule 33 Opp. at 3.

9

Moreover, "[t]he government's duty to disclose is not limited to 'exculpatory' information, it also includes information that could be used to impeach government witnesses, so-called *Giglio* material." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

Separately, "[i]n order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (alterations adopted) (internal quotation marks and citation omitted); *see also United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) ("A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (internal quotation marks and citation omitted)). "The perjury is 'material' if there is any 'reasonable likelihood that the false testimony could have affected the judgment of the jury,' and the prosecutor's knowing use of perjured testimony can violate the Due Process Clause even if it only undermines a witness's credibility." *Cromitie*, 727 F.3d at 221–22 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

b. Analysis

The government concedes that the notes from Cooperating Defendant #1's proffer regarding Segovia-Pineda "should have been produced to the defense in time for their effective use in cross-examining Segovia-Pineda on the . . . topic of the . . . rape." Gov. Rule 33 Opp. at 5. The government, however, argues that its failure to produce the notes does not warrant a new trial because Escobar has not satisfied the materiality requirement of a *Brady* violation—namely, that there would have been a "reasonable probability of a different result" at trial had the information been disclosed. *Jackson*, 345 F.3d at 73. The government similarly contends that, even assuming Segovia-Pineda's testimony regarding his lack of involvement in the rape was perjured (which the government asserts Escobar has failed to demonstrate), there is no likelihood that any such perjured testimony affected the jury's verdict. The Court agrees.

First, the late-disclosed impeachment evidence is not material because it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Jones*, 965 F.3d 149, 164 (2d Cir. 2020) (internal quotation marks and citation omitted); *accord United States v. Avellino*, 136 F.3d 249, 256–57 (2d Cir. 1998). As an initial matter, it is important to note that Segovia-Pineda was in fact questioned about the rape during cross-examination by defense counsel. *See* Trial Tr. at 519–22. Moreover, even assuming *arguendo* that the additional information regarding his alleged involvement in the rape would have allowed for additional cross-examination on that topic, Segovia-Pineda's testimony was impeached in numerous other significant respects including, *inter alia*, by his testimony that: (1) he was a member of the MS-13 and had participated in the brutal murder of four individuals, *see* Trial Tr. at 443–59-C, 554–58; (2) he was testifying pursuant to a cooperation agreement with the government, with the hope of receiving a letter from the government under U.S.S.G. § 5K1.1, as well as immigration benefits and a recommendation for the Witness Security Program, *see id.* at 392–94-C, 548–50, 558; (3) he was under the influence of marijuana

during certain events that were the subject of his testimony, *see id.* at 552–54; and (4) he had lied to law enforcement in the past, including when he was initially questioned about the April 11 murders, *see id.* at 536–38. Given this extensive impeachment material available to defense counsel that was utilized during the trial to undermine Segovia-Pineda's credibility, the additional late-disclosed impeachment material regarding Segovia-Pineda's alleged involvement in a rape was cumulative, and had no probability of affecting the outcome of the trial.

Second, the rape was ancillary to the charged crimes. The rape did not involve Escobar, nor was there any testimony or other evidence that she was aware of the rape. To the extent Escobar suggests that she would have not only used the proffer notes regarding the rape to impeach Segovia-Pineda, but also to support her contention as part of her defense that female associates are at risk of being victimized by male members of the MS-13, she fails to show how the late-disclosed information was material to that argument. Even though Segovia-Pineda denied his involvement in the rape, he confirmed that female associates of the MS-13 were at risk of such violence during his testimony about his knowledge of this rape from others. *See* Trial Tr. at 522 ("Q. And nobody could or would stop him [from raping her] because Santanico was a homeboy [*i.e.*, high-ranking member of the MS-13], right? A. Yes."). In other words, Segovia-Pineda's involvement or lack of involvement in the rape did not materially impact Escobar's ability to argue to the jury that she was in fear of the MS-13, and defense counsel indeed made an argument regarding her fear to the jury in summation. *See* Trial Tr. at 1491–94.

Finally, and most importantly, the government's proof of Escobar's guilt on the charged crimes was overwhelming even without the testimony of Segovia-Pineda, who never spoke directly to Escobar about the murders prior to the murders taking place. *See* Trial Tr. at 550–51. More specifically, cooperating witness Gomez testified in great detail about direct communications she had with Escobar regarding their participation in the murders at every stage, including vetting the victims, planning the murders, luring the victims, and concocting a false narrative for law enforcement after the murders. *See, e.g.*, Trial Tr. at 1020-C, 1076–78-C, 1081–82-C, 1118-C, 1122-C, 1151–53-C, 1156–58-C, 1164–70-C, 1191-C. Cooperating witness Gaitan-Rivera also testified about direct conversations he had with Escobar about vetting the victims and the murder plan, and he recounted her admissions to him after the murders with respect to her role. *See, e.g.*, Trial Tr. at 709–10-C, 807–08-C, 810–16-C. The cooperator testimony was corroborated by additional compelling evidence, including recorded prison calls following the murder between Escobar and Amador, electronic communications (such as social media posts and text messages), cell site location data, and phone records. *See, e.g.*, Gov. Exs. 504, 601h, 603.c.1, 603.c.5, 603.c.6, 603.c.7, 604a, 701, 801–05.

For example, in a recorded prison call to Amador on April 12, 2017, Escobar admitted to her participation in the April 11 murders (using the word "train" as a code for the murders) and tried to explain her concern regarding the fifth individual who got away and knew of her involvement in luring the victims:[6]

---

[6] That fifth victim testified at trial regarding how he was able to escape after Escobar and Gomez lured him to the wooded area and he and his four friends were surrounded by MS-13 gang murders. *See* Trial Tr. at 87–99-C.

11

Four individuals are no longer here. I don't know if they'll ever come back, got me? They left on the train last night, got me? Around—got me?—a certain time—got me?—that you know, one of them didn't, got me?...and he knows stuff, got me? He knows.

Gov. Ex. 802T at 6; *see also id.* at 9 ("AMADOR: But they, they, they're 18th Street? ESCOBAR: Yeah, but they're not here anymore. Now—got me?—now they are somewhere else—got me?—seeing the light. No more, got me? Out of here already—got me?—not on the map."); *id.* at 16 ("AMADOR: F**k! So, you sent them, you sent them on the train just for them to go see the light? ESCOBAR: Hmm, yeah, I came, yeah, and did everything. I brought them there. . . . I did everything. I did everything. I admit that . . . ." (alteration added)); *id.* at 17 ("AMADOR: When the train took them, were you also there present among them? ESCOBAR: Yeah. Yeah, yeah.").

Escobar emphasized that she did not bring the victims to the location to hang out, but to be killed:

> AMADOR: I know that you like to hangout on the street, yo. You see that you were hanging out?
>
> ESCOBAR: No, that was not it! Oh, my God! That was not hanging out. Don't you understand that it's not from hanging out? It was not a hangout. It was for the train to take them.

Gov. Ex. 802T at 20.

Escobar further admitted during the recorded call that she was not forced by her co-conspirators to participate in the murders:

> AMADOR: So did they force you?
>
> ESCOBAR: No, I did it myself, like I'm telling you, I did it myself, so now it's my turn.

Gov. Ex. 802T at 14. In another recorded call, also on April 12, 2017, Escobar explained that she was happy about the murders until she learned that one of the victims got away:

> AMADOR: What—what did you think you'd get out of all this?
>
> ESCOBAR: Nothing. I was gonna be happy. Because I was really happy. I'm telling you straight out, I was happy for this to happen.
>
> AMADOR: Yeah, I know that you get excited with stuff like that, with crazy stuff— you know.
>
> ESCOBAR: Yeah, . . . I was happy for that to happen. But then once, hmm, that other guy, um, called, I said, "F**k, it can't be!"
>
> AMADOR: I don't know how it is that he missed the train when all five were served on a silver platter.
>
> ESCOBAR: Exactly. He got away. He got away from them. Better yet, it was a mistake.

Gov. Ex. 803T at 5–6 (alteration added).

In sum, a new trial is unwarranted on the alleged *Brady* violation, as well as the alleged use of perjured testimony, because it is abundantly clear based upon the overwhelming evidence of Escobar's guilt on each count that there is no reasonable probability or likelihood that the impeachment material regarding Cooperating Defendant #1's statements about Segovia-Pineda's involvement in a rape and/or Segovia-Pineda's allegedly perjured testimony on that issue could have affected the jury's verdict in this case. Accordingly, the motion for a new trial on these grounds is denied.

2. Alleged Newly Discovered Evidence

Escobar also seeks a new trial based upon the new availability of a witness who had participated in the April 11 murders and could provide allegedly exculpatory evidence for Escobar. More specifically, prior to trial, the government disclosed the identity and proffer statement of a co-conspirator in the murders (hereinafter, "Co-Conspirator #1") who had been charged as a juvenile in the murders and was incarcerated in El Salvador. In his statement to law enforcement, Co-Conspirator #1 described his participation in the murders, as well as Escobar's role in luring the victims to the wooded area, and stated that he saw Escobar and cooperating witness Gomez crying in the distance after the murders. On August 10, 2022, following Escobar's trial, Co-Conspirator #1 was extradited to the United States and the government provided an updated disclosure regarding the extradition to Escobar's counsel shortly thereafter. Co-Conspirator #1 remains charged in a sealed proceeding.[7]

Escobar contends that Co-Conspirator #1's availability in the United States to testify about this proffered information—namely, that she was crying in the aftermath of the April 11 murders—is exculpatory and constitutes "newly discovered" evidence warranting a new trial. The Court disagrees.

a. Applicable Law

As the Second Circuit has made clear,

[r]elief under Rule 33 based on newly discovered evidence may be granted only upon a showing that (1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

*United States v. Forbes*, 790 F.3d 403 at 406–07 (alteration adopted) (internal quotation marks and citation omitted). Further, "in order to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but [she] must also demonstrate that the evidence could not with due diligence have been discovered before or during trial." *Id.* at 408–09 (internal quotation marks and citation omitted).

b. Analysis

As an initial matter, the Court concludes that the updated information regarding Co-Conspirator #1's extradition to the United States after the trial does not constitute

---

[7] The government stated, in its opposition to this motion, that it has conferred with Co-Conspirator #1's defense counsel, who has indicated that his client would invoke his Fifth Amendment privilege against self-incrimination if called as a witness in this case. *See* Gov. Rule 33 Opp. at 5.

"newly discovered evidence" under Rule 33. Escobar concedes that the government disclosed Co-Conspirator #1's identity and post-arrest statement prior to her trial and, thus, does not argue that the evidence was first discovered after trial. *See United States v. Owen*, 500 F.3d 83, 89–90 (2d Cir. 2007) (explaining that "[o]ne does not 'discover' evidence after trial that one was *aware of* prior to trial").

Although Escobar argues that her inability to procure Co-Conspirator #1's testimony while he was incarcerated in El Salvador makes his extradition to the United States "newly discovered evidence," the Court finds that argument unpersuasive. Escobar has not demonstrated any efforts to locate and contact Co-Conspirator #1's counsel in El Salvador, including to determine whether his deposition testimony could be taken for use at trial, pursuant to Rule 15 of the Federal Rules of Criminal Procedure. As the Second Circuit has explained, "[w]hen a defendant knew or should have known that [her] codefendant could offer material testimony as to the defendant's role in the charged crime, [her] inability to procure that testimony before or during trial should not be redressed by granting [her] a new trial when the codefendant asserts his willingness to exculpate the defendant after the original trial is over." *Owen*, 500 F.3d at 92. Indeed, the Second Circuit has rejected the argument that, because a potential witness is represented by counsel and detained in another facility, his testimony could not be obtained by due diligence. *See United States v. Muja*, 365 F. App'x 245, 246 (2d Cir. 2010) (summary order) ("It is well established . . . that a co-defendant's mere unavailability cannot transform evidence that existed all along into newly discovered evidence." (internal quotation marks and citation omitted)).

In support of her motion, Escobar relies on the Second Circuit's language in *Forbes* that "[i]f the defendant is later able to locate [a witness who previously could not be found], provided that the other requirements for Rule 33 are satisfied, [the witness's] testimony would be newly discovered within the meaning of Rule 33." 790 F.3d at 409. That situation, where a witness's whereabouts are unknown, however, is inapposite to the instant circumstances, where Co-Conspirator #1 had been found prior to Escobar's trial and was incarcerated in El Salvador. Under such circumstances, even if the witness was unavailable due to the invocation of the Fifth Amendment privilege, any "subsequent post-trial waiver of this privilege [would] not make his testimony 'newly discovered' within the meaning of Rule 33." *Forbes*, 790 F.3d at 409. In other words, "waiver merely makes [the witness's] testimony 'newly available'—it does not make [the witness's] testimony 'newly discovered' within the meaning of Rule 33." *Id.* Indeed, Co-Conspirator #1 remains just as unavailable as he was in El Salvador, because he has indicated, through counsel, that he would invoke the Fifth Amendment if called to testify. In any event, even if he were willing to waive that privilege, his extradition to the United States and availability to testify would not constitute newly discovered evidence after trial for purposes of Rule 33.

Even assuming *arguendo* that Co-Conspirator #1's extradition to the United States could be considered "newly discovered" under Rule 33, a new trial is unwarranted because there is no likelihood that this potential testimony could have impacted the jury's verdict. First, there was testimony at the trial that both Escobar and Gomez were feigning shock or remorse to distance themselves from the murders. *See* Trial Tr. at 814-C (Gaitan-Rivera testifying: "[Escobar] and Keyli [Gomez] were acting as if they didn't know what was going on, that

14

they were crying and screaming and pretending that they didn't know what was going on there."); *id.* at 1157-C (Gomez testifying: "I acted like—I pretended to be crying"). Second, other portions of Co-Conspirator #1's statement, including that Escobar lured the victims, would have been damaging to her defense. Finally, even if that testimony by Co-Conspirator #1 could be used by Escobar to support her defense and impeach the government's cooperating witnesses, the Court again concludes that, given the overwhelming evidence at trial unequivocally establishing Escobar's guilt on each count beyond any doubt (including her devastating admissions on the recorded prison calls), there is no likelihood whatsoever that Co-Conspirator #1's testimony would result in an acquittal on any of the charged crimes. Accordingly, the motion for a new trial on this ground is denied.

IV. CONCLUSION

For the foregoing reasons, the Court denies Escobar's motions for a judgment of acquittal and for a new trial in their entirety.

SO ORDERED.
s/Joseph F. Bianco

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: March 4, 2024
Central Islip, NY

\* \* \*

The United States is represented by Assistant United States Attorneys Paul G. Scotti, Justina L. Geraci, and Megan E. Farrell, of the United States Attorney's Office for the Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722.

Defendant Leniz Escobar is represented by N. Keith White of Keith White, PLCC, 198A Rogers Avenue, Brooklyn, New York 11225, and Jesse M. Siegel of the Law Offices of Jesse M. Siegel, 299 Broadway, Suite 800, New York, New York 10007.