U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:MEF/PGS/JLG
F. #2016R01021

*610 Federal Plaza*
*Central Islip, New York 11722*

July 30, 2024

By ECF
The Honorable Joseph F. Bianco
United States Circuit Judge
United States Court of Appeals for the Second Circuit
100 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Leniz Escobar
     Criminal Docket No. 21-101 (JFB)

Dear Judge Bianco:

  The government respectfully submits this letter in advance of the sentencing of defendant Leniz Escobar, also known as "Diablita" ("Escobar" or the "defendant"), which is presently scheduled for August 15, 2024 before this Court. On April 11, 2022, the defendant, an associate of the violent transnational criminal organization La Mara Salvatrucha, also known as the MS-13, was convicted after trial of one count of Racketeering and four counts of murder in aid of racketeering; and with respect to the Racketeering count, Escobar was found to have engaged in a conspiracy to murder, four predicate acts of murder, and a conspiracy to obstruct justice. The defendant's conviction pertains to her participation in the April 11, 2017 murders of Justin Llivicura, Michael Lopez, Jorge Tigre, and Jefferson Villalobos, who were brutally attacked and killed by more than a dozen MS-13 members and associates after the defendant lured the victims to a park in Central Islip.

  As set forth in the Presentence Investigation Report ("PSR"), dated September 20, 2022, the defendant's total offense level is 49, but because the maximum total offense level under the Guidelines is 43, the offense level should be treated as 43. PSR at ¶98 and n.1. Further, because the defendant should be sentenced within Criminal History Category I, the advisory Guidelines sentencing term is life imprisonment. PSR at ¶¶ 142-43.

  The defendant's sentencing submission dated March 20, 2024 (the "Defense Memorandum" or "Def. Mem.") argues that this Court should consider a downward variance from the applicable Guidelines range and impose a sentence substantially less than 55 years (Def. Mem. at 29), and no more than 32 years' incarceration. (Id. at 24). For the reasons set forth below, the government respectfully submits that, after considering the factors set forth in

18 U.S.C. § 3553(a), as well as the those set forth in Miller v. Alabama, 132 S.Ct. 2455 (2012), in particular, the seriousness of the offense, the need for deterrence, and for the sentence to promote respect for the law, the Court should sentence the defendant to a term of 65 years' custody, which is still below the applicable Guidelines term of life.

## I. Background

The defendant's arrest and conviction resulted from an investigation by the government and Federal Bureau of Investigation's Long Island Gang Task Force (the "Task Force") into a series of violent crimes committed by MS-13 members and associates across Long Island and Queens. As set forth in the PSR, the defendant, who is an associate of both the Leeward Locos Salvatruchas ("Leeward") clique and the Brentwood Locos Salvatruchas ("Brentwood") clique of the MS-13, together with numerous other MS-13 members and associates of the Leeward clique and other cliques, worked together to carry out the April 11, 2017 murders of Llivicura, Lopez, Tigre and Villalobos (the "April 11 Murders").[1]

On April 12, 2017, at approximately 8:00 p.m., members of the Suffolk County Police Department ("SCPD") responded to a wooded area adjacent to the Central Islip Recreational Center, which is located at 555 Clayton Street, Central Islip, New York 11722 (the "Park"), and found the mutilated bodies of Llivicura, Lopez, Tigre and Villalobos piled together. All four victims had significant sharp-force and blunt-force injuries covering their bodies. Subsequent investigation determined, as explained in more detail below, that the four victims were brutally attacked and killed by more than a dozen MS-13 members and associates after being lured to a park in Central Islip by the defendant and another female, Keyli Gomez ("Gomez"), because the gang suspected that the victims, and a fifth individual, who escaped ("Witness-1"), were members of the rival 18th Street gang and/or had represented themselves to be MS-13 members, when, in fact, they were not. Other participants in the April 11 Murders include Josue Portillo, also known as "Sparky" ("Portillo"), Freiry Martinez, also known as "Discreto" ("Martinez"), and Sergio Segovia-Pineda, also known as "Temible" ("Segovia-Pineda").

### A. The Defendant's Association with the MS-13

Before this plan ever took shape, the defendant was associating with the MS-13 on a regular basis, including dating Jeffrey Amador, also known as "Cruel" ("Amador"), a senior member or "homeboy" in the Brentwood clique of the MS-13. Tr. at 362, 559, 797-99, 1055-59. Escobar socialized with Amador's gang associates and friends, including David Gaitan Rivera ("Rivera"), who had the lower rank of "chequeo" in the Brentwood clique, both before and after Amador was arrested. Id. at 719, 798-99, 802-805. These gang members trusted Escobar, going so far as to discuss gang business in front of her, and in turn, she would report other gang members as "posers" for not engaging in acts of violence. Id. at 799-801.

---

[1] Unless otherwise indicated, the information below comes from the PSR at paragraphs 17-36. References to the trial transcript are referred to as "Tr." and references to government exhibits are referred to as "GX."

2

Because the "gang trusted her," the defendant was permitted to keep Amador's car, which belonged to the Brentwood clique, after he was arrested and detained in connection with a different federal case. Id. at 762. Escobar also introduced Gomez to these Brentwood clique members and associates. Id. at 714, 1059.

The defendant likewise socialized with more junior MS-13 members and associates in Central Islip, most of whom were associated with the Leeward clique, and they knew her as "Diablita," which means "little devil." Id. at 333, 414-15, 469; see also 801. During those encounters, the defendant "behaved like she was part of . . . [the gang]" or like a "homegirl," and spoke like she was a gang member. Id. at 414-15 (Segovia-Pineda testimony); see also Tr. at 801 (Rivera testimony, describing defendant as "behaving as though she were one of us"). On at least one occasion, the defendant challenged these gang members to engage in more acts of violence. Id. at 416-18 (Segovia-Pineda testified that the defendant said the Central Islip MS-13 members "talk[ed] like [they]'re on the streets" but they were not out there "doing anything for the MS, [and] that [they] just did not have the balls to kill . . . ."). Thus, even before the April 11 Murders, the defendant demonstrated her allegiance to the gang in her actions and demeanor. As explained in more detail below, this allegiance continued even after the defendant's arrest and incarceration in this case.

Relatedly, both Rivera and Segovia-Pineda testified that although women cannot be full-fledged MS-13 gang members, they can be associates. Tr. at 330-31 (Segovia-Pineda testimony); 828 (Rivera testimony). In exchange for participating in crimes on behalf of the gang—including luring rivals out to be killed—female associates can earn the trust and respect of the gang. Id. at 330-32 (Segovia-Pineda testimony), 752-53 and 828 (Rivera testimony). Gomez admitted during testimony that the desire to obtain this respect is ultimately what drove her to associate with Escobar, who already had already obtained it, and participate in the April 11 Murders. Id. at 1052-54, 1063-64, 1087.

B. The April 11 Murders and the Defendant's Role (PSR at ¶¶ 17-23)

When it came to the plan to kill Witness-1, Escobar was intimately involved for weeks in advance, including by vetting the target with multiple MS-13 gang members. Indeed, the first time that Escobar socialized with Witness-1, who she met through Gomez, she instructed Gomez to "keep [her] eyes peeled on Alex," who Escobar viewed as "suspicious." Tr. at 1079. Relatedly, for at least one month prior to the murders, Escobar befriended Witness-1, even flirting with him and connecting with him on social media. Id. at 1079-83. Then, approximately one week prior to the murders, Escobar asked Gomez whether she had seen pictures of Witness-1 on social media in which he was throwing MS-13 hand signs—and knowing that such pictures were disrespectful to the gang and would be viewed as such—Escobar suggested to Gomez that they show the pictures to members of the gang in Central Islip. Tr. at 1085-87. As a devout associated of the gang, Escobar was personally insulted by the photos, and at her suggestion, she and Gomez showed the inflammatory pictures of Witness-1 to Portillo, who had previously had an altercation with Witness-1, Martinez, and others. Predictably, Portillo and his associates decided that Witness-1 needed to be killed, a plan with which the defendant agreed. Tr. at 1087-92 and 1102-04. Almost immediately

3

thereafter, Escobar and Gomez called Witness-1 to see if he could come out, but this first attempt was unsuccessful because Witness-1 was unavailable. Id. at 1105-06.

Escobar also conferred with Rivera to vet Witness-1 before setting him up to be killed. Tr. at 807 (Rivera testimony), 1123-24 (Gomez testimony). The meeting occurred at a local mall, and while there, Escobar asked Gomez for her cellphone so that she could show Rivera a picture of Witness-1, and then asked whether he was a member of the MS-13. Id. at 807-808, 1123. In the photo (GX 601.A.15), Witness-1 is wearing a hat, rosary beads and other items that typically signify membership in the MS-13, and thus impersonating a member of the MS-13. Id. at 807-809. Escobar further shared that "the MS-13 Central Islip guys had had issues with him, that he had disrespected them and that they wanted her and Keyli to bring him out somewhere" to kill him. Id. at 810-811. Moreover, the defendant invited Rivera to join them when they took Witness-1 out to be killed so he could assess whether the MS-13 members in Central Islip were performing well. Id. at 811.

On April 11, 2017, after weeks of planning and at least one failed attempt, Escobar and Gomez contacted Witness-1 and invited him to go to the Recreation Center with them under the guise of smoking marijuana. In those hours before the eventual attack, Gomez and Escobar hung out together, driving around and, while doing so, communicating with Witness-1, who informed Gomez and Escobar that he was with the four victims. Tr. at 79-82 (Witness-1 testimony); 1128 (Gomez testimony). At one point that evening, Gomez told Escobar that she did not "feel like going out," and Escobar encouraged Gomez, telling her that "[they] have to do this together," referring to taking out Witness-1 and his friends. Id. at 1129. Indeed, Gomez testified that but for the involvement of Escobar, she would never have lured Witness-1 and his friends to the Park, as she did not have the courage to do so. Id. at 1199.

That same evening, Portillo and several other MS-13 members who had been involved in planning the murders, gathered in the woods adjacent to the Recreation Center at a lean-to structure that was built by the gang members and used as a meeting place. More than a dozen MS-13 members and associates continued to arrive at the location, several of whom, unlike the defendant, were previously unaware of the plan to attack Witness-1 and his friends. Once there, the members who had been planning the attack, including Portillo, instructed the others to prepare themselves, because the females were bringing a group of rivals to the Park for them to attack and kill. The MS-13 members and associates discussed the plan, divided up weapons, including knives, machetes and clubs made of tree limbs, and waited for the victims to arrive.

While Portillo and the other MS-13 members prepared themselves in the Park, Witness-1 and the four victims came to Escobar's house to pick up Gomez and Escobar, after which they drove to the Park. Tr. at 82-84. While they were all in the car, both Gomez and Escobar used Gomez's phone to message their co-conspirators, including Portillo, to let them know that they were bringing five people to the Park. Tr. at 1142-45. Further, Gomez and Escobar provided Portillo with updates regarding their arrival time and their location in the woods, which was relayed to the other MS-13 members to coordinate the attack.

4

Once Witness-1, the four victims, Escobar and Gomez arrived, Escobar led them through the woods to a pre-determined location deeper inside of the Park. Tr. at 87-88. Then they began smoking marijuana near a fallen tree. Id. at 90-91. Based on the location information that was received from Escobar and Gomez, the MS-13 members and associates came to the appointed location, divided into groups, surrounded the victims, and ordered them not to move and to get on the ground. Id. at 93-94. At the time, Gomez and Escobar got down on the ground, and pretended that they too were victims. Tr. at 1149-50 and 1180-81 (Gomez testimony); 448-49 (Segovia-Pineda testimony); 814 (Rivera testimony). Witness-1 immediately jumped over a fence and escaped. Id. at 95-100. The remaining four victims, some of whom tried to run, were caught, thrown to the ground and surrounded by the MS-13 members. Lopez, one of the victims who had been brought back to that location and was bleeding at the time "apologized to [Escobar], and touched her arm," which left a stain on her shirt. Tr. at 1152-53. When Lopez did this, Escobar smiled (id. at 1153) and, according to her own statements, even licked blood off her lips (id. at 814-15, 820). Thereafter, the MS-13 members who were armed with machetes, knives and an axe, including Portillo and Martinez, moved each of the victims deeper into the woods and then hacked, stabbed and slashed them to death in a frenzy of violence. As this happened, Gomez and Escobar remained in the same location, listening to the victims' screams and moans. Tr. at 1153-54. When Gomez complained to Escobar about the noise, Escobar instructed her "not to worry." Id. at 1154.

After killing the four victims, the MS-13 members and associates, who were concerned because Witness-1 had escaped and might call the police, dragged the victims' bodies a short distance, left them in a pile, and fled the scene. Around the same time, Escobar and Gomez left the Park, and while still in the vicinity, called Witness-1 to get him to return to the Park so that he could be killed. Id. at 815 (Rivera testimony); 1157-61 (Gomez testimony). Further, Escobar instructed Gomez to "send an audio note to [Witness-1] kind of like pretending that [they] were victims also." Id. As made clear by Gomez's testimony, it was Escobar's idea to call Witness-1, and the reason was "to make him understand that [they] had been victims also, so that he would come out with [them] again." Id. at 1157-58. Later that evening, Witness-1 called Escobar, and he told her that he had gone to a specific location to be picked up, and in response, Escobar told Witness-1 that the females had also been victims. Id. at 105-107 (Witness-1 testimony); 1159 (Gomez testimony).

Thereafter, a co-conspirator of Escobar and Gomez picked them up at the Park. While in the car, Escobar told the driver about the murders, and as explained by Gomez, she was "happy, with pride" at the time. Id. at 1162. Later that evening, Gomez and Escobar watched the news together and talked about what they would tell the police if they were ever interviewed. Id. at 1167. The following day, Escobar left Gomez's home and went to see the dead bodies of the four victims. Id. at 1168.

C. The Defendant's Obstruction of Justice (PSR at ¶¶ 25-27, 34, 57)

Approximately one day later, on the evening of April 12, 2017, Escobar called Gomez and informed her that "someone wanted to speak to [her]," which turned out to be a member of the Brentwood clique. Id. at 1169-71. While in Escobar's car, this person, known

5

as "Cofla," instructed Gomez that if she was "questioned by the police that [she] should say nothing, like [she] didn't know anything." Id. at 1171. That same day, Escobar and Cofla, with Gomez in the car, got rid of Escobar's sweatshirt from the night before, which had Lopez's blood on it from when he had touched her and asked for her forgiveness. Id. at 1171-72.

In the wake of the murders, Escobar and Gomez had a series of conversations about what their story would be if interviewed by the police. Id. at 1168, 1183, 1186. Around the same time, Escobar changed her phone number, which she used to continue to engage with her co-conspirators. Id. at 1187-91. Escobar further instructed Gomez to download an application through which she could obtain a new phone number, and physically destroyed her own phone. Id. at 1192-93. Soon thereafter, Gomez and Escobar were both interviewed by the police, and as planned, lied about their involvement in the murders. Id. at 821 (Rivera testimony); 1196-97 (Gomez testimony). Nonetheless, Escobar became upset with Gomez because she had given details that would render their stories inconsistent. Id. at 1196-97. Escobar further expressed concern to Rivera that Gomez was not going to be able to withstand the pressure of law enforcement and asked Rivera to speak to Gomez and instruct her not to speak with law enforcement. Id. at 821-22.

Around the same time, Escobar encountered Segovia-Pineda at school, and she pulled him aside to tell him that the police were "looking for everyone who was responsible for the murders, and that the police had photos of some of" them. Id. at 484-85. Escobar further informed Segovia-Pineda that the police did not yet have a photo of him, but they did have photos of "other MS-13 members who had been involved in the murders." Id. at 485. Finally, Escobar described Central Islip as being "heated up," and advised Segovia-Pineda that he and the other participants in the murders should leave town. Id.

On April 14, 2017, when Escobar was driving in a car with Rivera, which was being surveilled by police, she destroyed her cell phone and threw pieces of it out of the car window, to render it unusable to law enforcement. Id. 823-26.

D.  The Defendant's Calls with Amador After the Murders (PSR at ¶¶ 35-36)

In the days immediately after the murders, the defendant spoke to Amador, who was incarcerated, on several occasions, during which she confessed to him about what she had done, describing her role in the murders, her motivation for participating and her concern about being caught. For example, in a call on April 12, 2017 at 1:57 p.m., Escobar told Amador, while attempting to speak in code, that "four individuals took the train and who knows when they'll be back," "There were going to be five individuals . . . [and] four of them left already . . . They took the train last night . . . One of them . . . missed the train." GX 801AV, 801T at 2-3. Escobar further explained in the same call that the victims were "18th Street" and even took credit for her role, proclaiming "*I* got them out."[2] Id. at 7-8. And when Amador tried to

---

[2]   Of note, when the defendant and Amador refer to the 18th Street gang, in Spanish, they use the word "dieciollas", instead of the proper word in Spanish, which is

6

insinuate that Escobar had somehow been involved by his own Brentwood clique associates, Escobar yelled at him, saying "You don't listen that all I'm telling you is that it's just me on that thing. It has nothing to do with you. Don't you understand that? It's me, me and me and me. Nothing to do with you. They don't know about you. It's me." Id. at 9. Most importantly, when Amador asked Escobar who told her to do that, she explained, "I did it myself" with another "family," or clique. Id. at 10-12, 14. And on a second call the same day, Escobar confided in Amador that she arranged the murders to be happy, saying "I was gonna be happy. Because I was really happy. I'm telling you straight out, I was happy for this to happen." GX 803AV, 803T at 5. On that same call, when Amador bemoaned that Witness-1, who had been served on a "silver platter," got away, Escobar blamed it on the "family," or the Central Islip gang members, saying that they made a "mistake." Id. at 6.

E. The Defendant's Arrest and Transfer to Adult Status

The defendant was arrested on July 13, 2017, and she has been in federal custody since that date.[3] At the time, she was charged by juvenile information. No. 17-CR-362, ECF Dkt No. 1. On May 18, 2018, the government filed a superseding juvenile information. No. 17-CR-362, ECF Dkt No. 29.

Following an evidentiary hearing, this Court issued a Memorandum and Order on June 11, 2018, ordering that, pursuant to 18 U.S.C. § 5032, the defendant be transferred to adult status (the "Transfer Memorandum" or "Transfer Mem."). No. 17-CR-362, ECF Dkt. No. 32. In doing so, the Court found that the "nature of the alleged offenses overwhelmingly favors, in the interest of justice, transferring the case to district court to try the defendant as an adult." Id. at 1. The defendant appealed this decision, and on December 26, 2019, the Second Circuit affirmed the defendant's transfer to adult status. No. 17-CR-362, ECF Dkt. No. 50.

On February 25, 2021, a grand jury in this district returned an indictment charging the defendant with racketeering, and the murder in aid of racketeering of each of Llivicura, Lopez, Tigre, and Villalobos (the "Indictment"). No. 21-CR-101, ECF Dkt. No. 1.

F. The Defendant's April 2020 Calls with Josue Gomez (PSR at ¶¶ 29-33)

Even after the defendant had been incarcerated for nearly three years, she continued to associate with and enforce the rules of the MS-13 gang. In a series of calls with Josue Gomez, also known as "Mensajero" ("J. Gomez"), in April 2020, the two discussed a female, "Tremenda," who was not in custody and who had violated the rules of the gang by speaking to Escobar about the gang's criminal activities without permission. GX's 807-812; see also Tr. at 384-86. During the calls, the parties discussed punishing Tremenda for these

---

"dieciochos," so as not to dignify the rival gang with the proper pronunciation of their name. See 802AV, 802T at 7.

[3] More than a dozen MS-13 members and associates have been charged in connection with the April 11 murders.

violations, Tremenda was even added to a call so that Escobar could confront her, and during that call, Escobar pressed Tremenda to admit her wrongdoing.  See GX 810AV, 810T.  Ultimately, J. Gomez ordered that Tremenda be assaulted as a punishment, and based on the calls, it appears that it did in fact take place.  See GX 811AV, 811T.  Relatedly, on an April 10, 2020 call, J. Gomez pressed Escobar on the possibility that she might violate the rules of the gang, and Escobar touted her loyalty, saying "I'm never going to do that . . . because mistakes are unforgivable . . . . So far no one has ever punished me like that. 'Cause look, I prefer to walk a straight line – than in zigzag . . . ."  See GX 811AV; 811T at 16.

G.  The Defendant's Trial and Other Procedural History

Trial in this matter began on March 14, 2022.  Thereafter, a total of 13 witnesses were presented, and approximately 100 exhibits admitted in evidence.  Trial concluded after four weeks, on April 11, 2022, with the jury finding defendant Escobar guilty on all five counts of the Indictment.  ECF Dkt. No. 130.

On March 4, 2024, the Court denied the defendant's motion for a new trial.  ECF Dkt. No. 190.

## II. The Defendant Should Be Sentenced to 65 Years in Prison

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 65 years in prison.

A.  Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a).  Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]"  Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)).  However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence.  Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a).  Id.  That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and

> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

In Miller v. Alabama, 567 U.S. 460 (2012), the Supreme Court discussed the differences between juvenile and adult behavior and characteristics, and distilled that discussion into four factors a sentencing court must consider when sentencing a juvenile defendant, namely: (1) the defendant's chronological age and characteristics, including immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the family and home environment that surrounded the defendant; (3) the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct; and (4) the possibility of rehabilitation (referred to herein as the "Miller factors").[4] Miller at 476-78.

As set forth below, in connection with the analysis of the § 3553(a) factors, while the Court must consider the defendant's age, family and social background, and possibility of rehabilitation, these factors, and more importantly the facts and circumstances of the four murders and the defendants lack of remorse, overwhelmingly weigh in favor of a substantial sentence for this defendant.

B. Analysis

Here, pursuant to Supreme Court precedent, the Court's "starting point and the initial benchmark" when determining the defendant's sentence should be the effective Guidelines range of life. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)). Considering the sentencing factors set forth by Congress in § 3553(a), and even considering the Miller factors, the government respectfully submits that the defendant should be sentenced to 65 years in prison.

1. Nature and Circumstances of Offense and Defendant's Role

With respect to § 3553(a)(1) and the third Miller factor (the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct), it is difficult to contemplate offense conduct that is more serious than the April 11 Murders. Four innocent, unarmed young people, ranging in ages from 16 to 20 years-old, went to a park expecting to hang out and smoke marijuana with some friends and girls, and, instead, their

---

[4] While the government acknowledges that the Miller decision is applicable to this case, the Court should note that there are significant factual distinctions between this defendant and the Miller defendants; most importantly, the nature of these murders and the premeditation present here, which was not the case in Miller.

9

lives were taken in the most horrific way imaginable. More than a dozen armed gang members and would-be gang members appeared out of the darkness, surrounded the victims, forced them to the ground and, ignoring their pleas for mercy, marched the victims deeper into the woods where they were butchered with machetes, knives and an axe, and bludgeoned with club-like tree limbs. Moreover, had Witness-1 not narrowly escaped, there would have been five victims killed that evening. And as noted by this Court in the Transfer Memorandum, here "the seriousness of the alleged offenses cannot be overstated." Transfer Memorandum at 12.

Moreover, as firmly established at trial—and contrary to the defendant's arguments that her role was "subservient," and "derivative and duplicative" of Gomez, who was the "primary female contact" (Def. Mem. at 21-23)—the defendant played a highly critical role in these murders. Indeed, loyal to the MS-13 gang and committed to not only its rules but also ensuring that the gang was respected by others, the defendant instigated these murders. Notwithstanding the fact that Portillo had previously had an altercation with Witness-1 and played a critical role in planning and executing this plot, it was the defendant who made these murders possible. Through a series of intentional and premeditated actions, the defendant demonstrated her wholehearted commitment to the plan to kill the victims. For example, the defendant used her relationship with Gomez to establish a connection with Witness-1, who was already disfavored by the gang, putting herself in a position to ultimately lure him out. Indeed, Gomez had known Witness-1 for an extended period, and she never planned to have him killed until Escobar became involved. Then, the defendant located and flaunted photos of Witness-1, posing as a gang member and thereby disrespecting the gang, to her fellow MS-13 associates, including Portillo and Martinez, as well as Rivera. Once the plan to lure Witness-1 and his friends was formalized, the defendant showed unwavering commitment to its execution, encouraging Gomez to follow through, communicating directly with Witness-1 herself, physically directing the victims to the Park when they were driving, leading them through the Park to the exact location where they would be executed, feigning shock upon the arrival and attack of the MS-13 members, and then trying to lure Witness-1 back to the Park after he had escaped.

Not only did the defendant play a critical role, but she also relished in it, as she refused Lopez's pleas for help, licked his blood off her lips and then bragged to Amador, Rivera and others about her actions. And even before this plot came into existence, the defendant regularly taunted members of the gang by accusing them of inaction and inciting them to engage in violence on behalf of the MS-13. Thus, although Gomez may have had longer relationships with Witness-1 and Portillo, as counsel suggests (Def. Mem. at 23), Escobar is not less culpable than Gomez because she leveraged Gomez's connections to fulfill her own personal mission of killing rivals of the MS-13 gang, and then encouraged Gomez to work with her in this heinous plot. Even Lopez knew Escobar was a driving force behind the murders, because, knowing that he offended the defendant by disrespecting the MS-13, he chose to apologize to her as a last-ditch effort to save his own life. In short, the defendant was the instigator, not a follower, and in her own words, that made her "happy."

Even after the murders, the defendant engaged in a calculated pattern of obstructive behavior, further demonstrating her commitment to the gang and its violent mission. This includes lying to law enforcement and portraying herself as a victim, instructing Gomez to lie to the police, encouraging male members of the gang, i.e., Rivera and Cofla, to engage in acts of intimidation by confronting Gomez and warning her not to speak with police, destroying physical evidence, and encouraging others to flee. Thus, although the defendant may not have been an official "member" of or leader in the gang (Def. Mem. at 21-22), she still conducted herself as one. Indeed, she said as much when she bragged to Amador about her role, saying "I got them out" and "It's me, me and me and me." This makes the defendant more culpable than many of the other participants, and not at all comparable to Anderson Sanchez (Def. Mem. at 28), who only found out about the plan to kill the victims on the day of the murder and played no role in luring them to their death.

For those reasons, a significant sentence is necessary to address the seriousness of the offense conduct, in which the defendant played a substantial role, and its consequences, including the terror, pain and suffering the young victims experienced, and the lifetime of anguish for their family members, whose lives are forever devastated by the senseless and violent loss of their loved ones.

2. The Defendant's History, Characteristics, Age and Social Background

Consideration of the history and characteristics of the defendant, pursuant to § 3553(a)(1), and the defendant's chronological age and social background, the first and second Miller factors, do not undermine the need for a substantial sentence. As to the defendant's age, Escobar was nearly 17 and one half at the time of murders (Def. Mem. at 18-19), which, at the time, was approximately two years older than Portillo and one year older than Martinez. Thus, even though she was a juvenile, she was only months away from turning 18.

The defendant argues that her age and social background, including physical abuse, emotional and physical neglect, lack of parental supervision, and sexual abuse weigh in favor of a lower sentence. Def. Mem. at 3-8, 19-21. But while the defendant's age and background are potentially mitigating factors, the same facts constitute "risk factors for future violence and recidivism." Transfer Mem. at 9. This risk is exacerbated by the defendant's persistent loyalty to the MS-13, both in the wake of the April 11 Murders and the years that followed. Beyond the defendant's refusal to cooperate with the investigation, lack of remorse, obstructionist conduct and ongoing relationship with Amador (Transfer Mem. at 10), she continued to engage in gang activity during her detention at the Essex Juvenile Facility ("Essex") before being transferred to adult status, including in April 2020 when she coordinated with J. Gomez to have another female associate beaten for violating the rules of the gang. In one of those calls, the defendant herself touted that she liked to "walk a straight line" when it came to the gang, proudly representing that she was still in compliance with its rules.

11

Relatedly, even while the defendant was attending classes and excelling academically at Essex (Def. Mem. at 8-11), she was continuing to "identify and associate with the MS-13." Transfer Mem. at 10. This undermines the defendant's reliance on the positive reports from her high school teachers and staff as evidence of her progress towards rehabilitation (See Def. Mem. at 8-9). Although the defendant garnered praise from numerous educators, who described her as "one of [their] brightest, most determined and focused students" (Def. Mem. at 8), the April 2020 calls with J. Gomez establish that while she participated in those academic programs, she was actively involved in the MS-13 and focused on maintaining her standing in the gang. Moreover, this behavior evidences the defendant's ability to compartmentalize her actions, and thereby deceive and manipulate those around her. Thus, the defendant's scholastic accomplishments and reportedly constructive attitude, as described in these letters of support, are of little to no mitigating value and do not support a claim of rehabilitation when viewed in the context of her contemporaneous criminal conduct. Furthermore, the fact that the defendant continued those criminal relationships even after the benefit of reflecting on what she had done, undermines the mitigating value attributed to a juvenile's impetuosity and inability to appreciate risks and consequences, as contemplated by the first Miller factor.

Moreover, although the government does not deny that the abuse and neglect experienced by the defendant is tragic, the relevance of that mitigating evidence must be considered in the context of the extremely violent nature of the defendant's conduct. For example, although the defendant's childhood experiences placed her at a "higher risk for negative peer influence, poor decisions and delinquency" (Def. Mem at 19), "the MS-13 is more than just a 'delinquent peer group,' but rather a ruthless and violent street gang." Transfer Mem. at 10. Additionally, it would not be accurate to characterize the defendant's role in this crime as the product of "negative peer influences" or as evidence of a desire for "recognition and validation" (Exhibit C to Def. Mem. at 12) when she was the instigator. While the defendant's experiences might explain responsive participation in crime in exchange for recognition, they do not explain why she acted as a driving force behind a plan that involved gang members who were younger and less experienced than her boyfriend, Amador, who was already incarcerated. Similarly, although sexual abuse by family members may cause "relationship mistrust, codependency, and feeling unlovable" as well as "a profound sense of powerlessness" (Exhibit C to Def. Mem. at 12), there is nothing in the defendant's submission to suggest that such abuse would cause her to intentionally harm others or derive pleasure from their suffering, which is particularly relevant here given the extreme violence used to kill the victims.

The government respectfully submits that, although the defendant did not have a criminal record before the instant offense, she committed these murders as a knowing and voluntary associate of the MS-13 and in furtherance of its violent mission, both of which support a significant sentence. As demonstrated by the evidence a trial, the defendant was enthusiastically committed to every aspect of the MS-13 gang, embraced the rules, challenged the male associates to affirmatively act on behalf of the gang, and sought out and accepted the ultimate task of a female associate, i.e., luring targets to their death. Indeed, after these horrific killings, the defendant expressed her pleasure, satisfaction, and sense of accomplishment for

what she had done, and delighted in the respect she garnered as a result. And when Amador pressed the defendant on why she got involved in the murders and whether she had been influenced by others to participate, the defendant defiantly rejected his efforts to minimize her role. Instead, she vehemently asserted that no one had pressured her to participate and plainly explained that it was "her turn" to demonstrate her commitment to the gang by killing rivals (GX 802AV, 802T at 14), later telling Amador that she did it to be happy and was happy after the victims were killed. The only regret or apprehension that the defendant articulated in any of the calls with Amador following the April 11 Murders, was that Witness-1 had escaped and survived the attack. See GX 803AV, 803T at 5-6. Thus, the defendant's unwavering commitment to the gang and total lack of regret supports a substantial sentence notwithstanding the defendant's lack of criminal history.

Given "her active involvement in the April 11 murders and obstruction of justice following those murders" as well as "the defendant's lack of a support structure, in the context of her alleged violent criminal acts and alleged ongoing association with the MS-13" (Transfer Mem. at 11), the defendant's age and social background support a substantial sentence just as they supported a transfer to adult status.

### 3. The Need for the Sentence to Reflect the Seriousness of the Offense, Afford Adequate Deterrence and Protect the Public

With respect to factors § 3553(a)(2)(A) and (B), for the reasons set forth above, the April 11 Murders were extremely serious crimes that need to be adjudicated in a manner that will promote respect for the law and provide just punishment for the offenses. The government respectfully submits that the sentence requested by the defendant for the person who instigated a crime that left four innocent young people dead would fail to provide a just punishment that reflects the loss of life, the pain and suffering experienced by the victims, and the anguish of their family members. Although the MS-13 gang is responsible for more than 60 murders on Long Island in the last two decades, this is the only occasion on which four, young, innocent victims were viciously and simultaneously killed, and further, if everything had gone according to plan, it would have been five victims. Given the level of planning, substantial loss of life, vulnerability and age of the victims, and overall level of violence, the April 11 Murders are fundamentally different from any other homicide crime committed on Long Island in recent history.

Relatedly, because Long Island has been plagued by gang violence over the past two decades, and particularly violence perpetrated by members of the MS-13, the need to afford adequate deterrence to criminal conduct, pursuant to § 3553(a)(2)(B), likewise weighs in favor of a substantial sentence. A sentence of 65 years in prison would send a strong message that this conduct will not be tolerated and will have severe consequences. Moreover, it will send a message to associates of the MS-13—regardless of whether they are male or female—that a person who instigates, plans and critically participates in such a violent crime is just as culpable as the people who physically attack and kill the victims.

Further, as set forth above, the defendant was a knowing associate of the MS-13 before <u>and</u> after participating in the April 11 Murders, and her persistent commitment to such a violent and destructive gang makes her a greater risk of being a recidivist and committing additional violent crimes in the future. And as noted above, the defendant's dysfunctional upbringing, while appropriately considered as a mitigation factor, also represents a risk factor for future recidivism. Relatedly, notwithstanding the staggering loss of life that resulted from the defendant's conduct, she has not demonstrated genuine remorse. As the victims were being killed, the defendant relished in their pain. After their death, she committed herself to obstructing justice. Moreover, the calls with Amador provide the Court with a rare look into the defendant's nature, evidencing her lack of empathy and connection with humanity, even after having time to reflect on the carnage that she caused. The defendant's response to her involvement in these crimes goes well beyond what would typically be viewed, in even the most serious murder cases, as a disregard for human life. Indeed, as reported by Dr. Barba Rioja, in her initial meetings with the defendant, Escobar was "emotionally detached" and lacked regard for others' emotions. Exhibit C to Def. Mem. at 17; <u>see also</u> <u>id.</u> at 14 (noting defendant did not voice remorse in 2017 evaluation). And in Dr. Barba Rioja's report of her more recent meeting with the defendant, although there are indications that the defendant is "more in touch with her emotions," there is very little information to support a conclusion that she feels genuine remorse or empathy. <u>Id.</u> (merely noting that the defendant "appears to have also reflected on the victims and the suffering caused to the victims' families" but not commenting on the existence of remorse).

Thus, considering the extreme nature of the violence that the defendant embraced and promoted, her steadfast commitment to the MS-13, and her persistent lack of remorse, a significant sentence is necessary to protect the public from future crimes of the defendant.

    4. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

Finally, the recommendation of 65 years in prison in this case is commensurate with the defendant's role when considering the recommendations and ultimate sentences for co-conspirators Portillo, who was sentenced to 55 years' incarceration, and Martinez, who was sentenced to 50 years' incarceration, both of whom planned and orchestrated the attack. <u>See</u> <u>United States v. Portillo</u>, 17-CR-366 (S-1)(JFB); <u>United States v. Martinez</u>, 17-CR-364 (S-1)(JFB). Significantly, unlike Portillo and Martinez, both of whom quickly accepted responsibility by pleading guilty to their crimes, the defendant has persistently failed to do so, and this warrants a more severe sentence than Portillo and Martinez. Although the defendant was not a hands-on participant, her vital role in the planning and execution of the murders elevates her level of culpability and distinguishes her from other participants, like her co-defendant Sanchez, who was not aware of the plot in advance of the murders and was sentenced to 32 years' incarceration (ECF Dkt. No. 174). Furthermore, Escobar's role was not merely duplicative of Gomez, who did not display any of the same leadership qualities. Instead, Escobar used Gomez's connections to facilitate the broader goal of killing MS-13 rivals, and a result, she is just as culpable as Portillo and Martinez. Indeed, notwithstanding the fact that Witness-1 was a target even before Escobar became involved, Escobar played a critical role in

realizing the desired end. Escobar provided the gang with additional evidence showing Witness-1 and several of the victims posing as MS-13 members, embraced the plan to kill Witness-1 and his friends, encouraged others to participate, fortified her co-conspirators beforehand, and even doubled down afterwards when Witness-1 escaped by trying to lure him back to be killed. Moreover, unlike Portillo and Martinez, who were 15 and 16, respectively, she was nearly 18 at the time of the attacks, and, as stated above, has neither accepted responsibility for her actions nor shown genuine remorse for the loss of life that she caused.

### III. Conclusion

Although the defendant was a juvenile at the time of the April 11 Murders, she played a critical role in one of the most brutal and horrific crimes committed by the MS-13 on Long Island. Nothing in the defendant's background justifies or explains such violence, and the § 3553(a) and Miller factors discussed above strongly warrant a significant sentence to deter the defendant and other MS-13 associates who are considering pledging themselves to the gang from committing similar horrific acts of violence. Furthermore, the defendant's request for a sentence at or below 32 years' is not justified and, if granted, such a sentence would not adequately address the unparalleled violence and loss of life in this case.

Thus, the government respectfully submits that a sentence of 65 years is sufficient but not greater than necessary to address the loss of life and the fact that the defendant committed these murders in furtherance of the violent mission of the MS-13 gang, and to protect the public from further crimes of this defendant. Moreover, such a sentence would appropriately balance the defendant's high level of individual culpability and lack of

acceptance of responsibility with the mitigating evidence presented, while still being consistent with the sentences of her co-conspirators.

                                  Respectfully submitted,

                                  BREON PEACE
                                  United States Attorney

                       By:    /s/ Megan E. Farrell
                                  Paul G. Scotti
                                  Justina L. Geraci
                                  Megan E. Farrell
                                  Assistant U.S. Attorneys
                                  (631) 715-7836/7835/7862

cc:    Jesse Siegel, Esq. (By ECF and email)
       N. Keith White, Esq. (By ECF and email)
       USPO Lisa A. Langone (By email)
       Clerk of the Court (JFB) (By ECF)